IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CATRINA FINLEY o/b/o
ANTHONY FINLEY,

                Plaintiff,

    v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

             Defendant.

CIVIL ACTION FILE NO.

1:05-CV-3335-JFK

## FINAL OPINION AND ORDER

Plaintiff Catrina Finley brings this action on behalf of her father, claimant Anthony Finley, pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g). [Doc. 2].   Plaintiff seeks to obtain judicial review of the final decision of the Commissioner of the Social Security Administration which denied the claimant's applications for a period of disability, disability insurance benefits, and supplemental security income.   For the reasons set forth below, the court **ORDERS** that the Commissioner's decision be **AFFIRMED**.

## I.     Procedural History

Claimant Anthony Finley filed applications for a period of disability, disability insurance benefits, and supplemental security income on February 13, 1997.  [R. at

135-38].   After his applications were denied initially and on reconsideration, an

administrative hearing was held on August 3, 1999.  [R. at 51-85, 194-247].  The

claimant died a little over three months later, on November 24, 1999. [R. at 395].  The

Administrative Law Judge ("ALJ") issued a decision on September 12, 2000, denying

the claimant's applications. [R. at 13-34].  After the Appeals Council denied a request

for review, an appeal was filed in the Northern District of Georgia on February 25,

2002, and the case was remanded back to the ALJ pursuant to a consent order.  [R. at

4-12, 381-85].  The claimant's daughter was substituted as the party in interest, and a

hearing was held on April 15, 2005.  The ALJ issued a decision on June 14, 2005,

denying Plaintiff's claim and finding that the claimant had not been under a disability

at any time before his death.  [R. at 365-78].  On December 23, 2005, Plaintiff filed a

complaint in this court seeking review of the final decision.  [Doc. 2].

## II.   Facts

The ALJ found that claimant Anthony Finley had mild levoscoliosis of the lower

lumbar spine, spondylolisthesis of the L-5 and S-1 joints, early (mild) degenerative

joint disc disease at the L4-L5 and L-5, S-1 joints, a seizure disorder, a shoulder

impairment, and left leg radiculopathy.  [R. at 377].  Although these impairments are

"severe" within the meaning of the Social Security Regulations, the ALJ found that

they did not alone or in combination meet or medically equal the criteria set forth for any impairment listed in Appendix 1, Subpart P, Regulations No. 4.  [R. at 377].  The ALJ found that while the claimant was unable to perform any of his past relevant work, there was other work existing in significant numbers which he was able to perform. [R. at 376-77].  Therefore, the claimant was not under a disability at any relevant time. [R. at 378].

The ALJ's decision [R. at 367-73] states the relevant facts of this case as modified herein as follows:

At the time of the first hearing in this case, the claimant was forty-four years old; therefore, he was considered to be a "younger individual."  He alleged that he became disabled on May 2, 1994.  He possessed a limited education and had worked in construction and as a pallet repairman.

Mr. Finley's daughter testified at the second administrative hearing that she witnessed her father having a seizure on the day he died.  She stated that she actually witnessed her father having seizures on two other occasions from 1994 until the day of his death and that she knew he had more because of hospitalizations.  She witnessed a seizure at the beginning of 1999, the year he died.  She testified that her mother was

3

holding him while he was shaking and that he stopped breathing.  Her mother administered CPR.  He came to, and the paramedics arrived.

The claimant's daughter indicated that her father had back problems and that his leg always hurt him.  For example, when he drove her to school and back, he would hold and massage his leg when he stopped at a traffic light.  She affirmed that he had problems standing and walking.  She said that he used a cane and did not stand for long periods of time.  She affirmed that he was taking some kind of pain medication, but she did not know its name.

The claimant's daughter also indicated that her father would ask someone to massage his back and rub it in order to relieve his back pain.  She was unaware of anything else that he did to alleviate back pain.  When asked about whether he missed school activities, she indicated that she did not participate in school activities.  She said that he went to her middle school graduation and kept his leg stretched out.  When asked about activities around the house such as washing clothes, cleaning house, and working in the yard, she said that he could not do any of those things.  She said that he could not cook standing but cooked sitting down.  She also testified that he had to sit down to iron clothes.

4

The claimant's daughter affirmed that he visited her at her home often and that she saw him daily because he carried her to and from school. She clarified this statement saying that, when she moved in 1996, he started carrying her brother and her to school on a daily basis because there was no bus. Before 1996, when they lived down the road from him, the children took the bus to school.

She testified that he did not work in the construction industry after 1994. She indicated that he did work for her aunt at such jobs as hanging ceiling fans. She stated that it took him a long time to install a ceiling fan and that he had to take frequent breaks while working. She also stated that he could not work on a job and only worked for family. She denied that he could work because he had to sit down frequently.

Jeana Sales, the mother of two of the claimant's children, also testified at the second hearing. Although she and Mr. Finley had children together, they never lived together. She said that she saw the claimant on a daily basis. In 1994, she was living in Pine Forest. She said that he used her address but stayed with his mother or sister on different occasions during the twenty years of their relationship. In 1994, she lived a few miles away from the claimant, and she was working.

5

In response to questions about his seizure disorder, Ms. Sales said that the claimant's mother said he had seizures as a child. In 1994, he had a seizure, and that was the first one she knew he had as an adult. Initially, she said that he was working with her brother painting and that he "fell out," perhaps from the paint. She said that he last worked in 1994 or 1995. Later, when asked about his painting with her brother, she denied that Mr. Finley was working. She stated that he was just hanging out with her brother who was performing work activity. She acknowledged that the claimant worked rebuilding pallets. She said that he worked at that job for six months in 1994, and she said that he worked in 1996 at some construction work for three months. She said that he could not work because he had to sit down every fifteen minutes.

After 1994, the next seizure Ms. Sales witnessed the claimant having was in 1999. She called 911 because she had never seen anything like it before. She said that he had four seizures in 1999. She said he had one at the beginning of 1999. About two weeks before his death, the claimant had another one at her house. She alleged that he died while experiencing a seizure.

When asked about the claimant's other health problems, Ms. Sales indicated that he had leg and back problems. She testified that he was always complaining about pain in his leg. She said that he could stand maybe fifteen minutes before he had to

6

have something to lean on.  She stated that he injured his back when he was twenty-four and that this injury started affecting him in later years.  She alleged that his doctor told him that he had a "slipped disc."

The ALJ considered the opinion of Dr. Bair, a physician who treated the claimant in September of 1996.  The record does not contain any records from Dr. Blair which reflect the number of visits the claimant made to him or the reasons for the visits.  Dr. Bair opined that the claimant's Grade II L5-Sl spondylolisthesis is congenital in nature suggesting that the claimant had the problem since birth and, thus, refuting the testimony that it was the result of an injury which occurred in claimant's twenties.  It appears that the claimant had worked in the past at relevant work with the defect.

According to the ALJ, Dr.Bair's findings in April of 1997, which indicated a Grade II spondylolisthesis, are in conflict with the records from Grady hospital during the same period which indicated that from 1996 and 1997 there was Grade I spondylolisthesis and no significant change in the claimant's spine over a year's time. The x-rays from Grady in 1996 indicated that the claimant's degenerative disc disease was early, inferring mild.  Based on the physical exam performed by Dr. Hansen on October 12, 1999, the claimant had no range of motion limitations in his back, and the

7

limitations in his left shoulder were attributed to osteoarthritis.  No other limitations were found.

The coroner reported that the claimant died from cardiac arrest during a seizure. This finding confirms Ms. Sales' testimony that the claimant quit breathing during a seizure, was revived and taken to the hospital where he died.  The coroner indicated the claimant's anti-convulsant level was sub-therapeutic, indicating possible non-compliance by the claimant with medical treatment.  There is other evidence in the record of the claimant's non-compliance on other occasions which bolsters the medical examiner's opinion regarding non-compliance.  Dr. Hansen's report demonstrated objective findings from the examination of the claimant's physical functioning in detail.  Although Dr. Hansen's report says the claimant was taking his medication as prescribed, lab tests indicated that the claimant's blood level was below the therapeutic range.  These results are in agreement with the coroner's finding.

A psychological examination was performed by Dr. Muller, who found that the claimant had borderline intellectual functioning but was capable of working at jobs with simple instructions.  Dr. Muller also noted that the claimant reported that he was physically impaired and not mentally impaired and that he had a history of alcohol abuse which was in remission.  The claimant reported to the doctor that his impairment

8

was not due to seizures and that he had worked until 1996 when he was fired because of problems with his legs.

The claimant testified at the August 1999 hearing that he had drawn unemployment after he last worked in 1994 and that he received unemployment until it "ran out." The ALJ took administrative notice of the fact that the claimant would have had to certify to the State of Georgia that he was able and willing to work in order to receive benefits. Such an assertion would have contradicted his allegations in the instant case that he was unable to work. At the 1999 hearing, the claimant stated that he could stand for only ten to fifteen minutes. He said that he could sit in one position for fifteen to twenty minutes, got stiff in the back, and had pain going down his left leg. Although surgery had been recommended, the claimant testified that he would not have the surgery because there was "no guarantee." He said that he could walk only half a block before having to sit down for ten minutes. He indicated that he had no side effects from medication which he took for pain. The claimant alleged that he could not get dressed independently and had to have help putting on his shoes. He said that he was depressed but denied crying. He also stated that he could not push or pull with his left arm or lift it above his head because his shoulder was allegedly dislocated, but he then stated that he had no problem putting on shirts. He also indicated that his

9

only problem in dressing was putting on his shoes which seems to contradict his prior assertion. When led by his representative, the claimant testified that he had headaches twice a day for forty-five minutes. He stated that he could not bend, squat, push, pull, lift, touch his toes, or lift his left arm. He said that he was injured twenty years ago but that the symptoms did not arise until four or five years prior to the hearing. Although the claimant alleged pain, he took NSAIDs for his pain and was not taking any opiates or steroids normally associated with controlling severe pain.

The claimant indicated that he only had seizures when he drank and that he always took his anticonvulsant medication. But the evidence and his own testimony indicate that he had seizures as a child and that they resumed later in life. The evidence also indicates that he had stopped drinking several years prior to his application for disability. The claimant's autopsy report indicated that he was not compliant with taking his medication as it was noted that his blood level for his anticonvulsant was below therapeutic levels at the time of death. He also said that he could not read or write, but testing indicated his overall academic performance was at the third grade level, and he reported that he dropped out of school in the ninth grade. Although the claimant reported in March of 1999 that he had stopped drinking many years before, he was drunk during an examination at Grady in 1997, and at his hearing,

he admitted he drank in July of 1999.  The claimant's daughter indicated that he was driving on a daily basis, but the claimant stated that he did not have a driver's license for the past eight years because it was suspended for DUI.  As noted previously, his daughter indicated in her testimony that he installed ceiling fans during the period at issue.

## III.   Standard of Review

An individual is considered to be disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See 42 U.S.C. §§ 423(d)(2) and (3).

The scope of judicial review of the Commissioner's decision is limited.  The court's function is (1) to determine whether the record, as a whole, contains substantial

11

evidence to support the findings and decision of the Commissioner and (2) whether the Commissioner applied proper legal standards.  See Vaughn v. Heckler, 727 F.2d 1040, 1042 (11th Cir. 1984).  Substantial evidence is more than a scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).

The claimant has the initial burden of establishing the existence of a "disability" by demonstrating that he is unable to perform his former type of work.  If the claimant satisfies his burden of proving disability with respect to his former type of work, the burden shifts to the Commissioner to demonstrate that the claimant, given his age, education, work experience, and impairment, has the capacity to perform other types of jobs which exist in the national economy.  See Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983).  Under the regulations as promulgated by the Commissioner, a five (5) step sequential procedure must be followed when evaluating a disability claim. See 20 C.F.R. §§ 404.1520(a) and 416.920(a).  In the sequential evaluation, the Commissioner must consider in order: (1) whether a claimant is gainfully employed, 20 C.F.R. §§ 404.1520(b) and 416.920(b); (2) whether claimant has a severe impairment which significantly limits his ability to perform basic work-related

12

functions, 20 C.F.R. §§ 404.1520(c) and 416.920(c); (3) whether claimant's impairments meet the Listing of Impairments, 20 C.F.R. §§ 404.1520(d) and 416.920(d); (4) whether claimant can perform his past relevant work, 20 C.F.R. §§ 404.1520(e) and 416.920(e); and (5) whether claimant is disabled in light of age, education, and residual functional capacity, 20 C.F.R. §§ 404.1520(f) and 416.920(f). If, at any step in the sequence, a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  See 20 C.F.R. §§ 404.1520(a) and 416.920(a).

**IV.    Findings of the ALJ**

The ALJ made the following findings:

1.    The claimant met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and was insured for benefits through December 12, 1999.

2.    The claimant had not engaged in substantial gainful activity since the alleged onset of disability.

3.    The claimant had the medically determined severe impairments of mild levoscoliosis of the lower lumbar spine, spondylolisthesis of the L-5, S-1, early (mild) degenerative joint disc disease at the L4-L5 and L-5, S-1, a seizure disorder, a shoulder impairment, and left leg radiculopathy.

13

4.  The claimant's medically determined severe impairments do not alone or in combination with other impairments meet or equal an impairment listed at 20 C.F.R. 404, Subpart P, Appendix 1.

5.  The claimant's and other witnesses' allegations regarding his limitations were not totally credible for the reasons set forth in the body of the decision.

6.  The claimant retained the residual functional capacity to lift and carry twenty pounds occasionally, lesser amounts more frequently.  His work can be performed sitting or standing with limited bending, twisting, crouching, or crawling for any kind of repetitive periods over a sustained period of time.  The work would not expose the claimant to moving machinery or unprotected heights.

7.  The claimant was unable to perform any of his past relevant work.  (20 CFR §§ 404.1565 and 416.965).

8.  The claimant was a "younger individual between the ages of 18 and 44."  (20 CFR §§ 404.1563 and 416.963).

9.  The claimant had "a limited education."   (20 CFR §§ 404.1564 and 416.964).

10.  The claimant had no transferable skills from any past relevant work.

11.  According to the testimony of the vocational expert, the claimant had the residual functional capacity to perform a significant range of sedentary work.  (20 CFR §§ 404.1567 and 416.967).

AO 72A
(Rev.8/82)

12.   Given the claimant's age, education, and RFC, there are a significant number of jobs in the national economy that he could have performed.

13.   The claimant was not under a "disability," as defined in the Social Security Act, at any time before his death.  (20 CFR §§ 404.1520(g) and 416.920(g)).

[R. at 376-77].

## V.   Discussion

In the present case, the ALJ found at the first step of the sequential evaluation that claimant had not been gainfully employed since the alleged onset of disability.  [R. at 377].   At the second step, the ALJ determined that the claimant had mild levoscoliosis of the lower lumbar spine, spondylolisthesis of the L-5 and S-1 joints, early (mild) degenerative joint disc disease at the L4-L5 and L-5, S-1 joints, a seizure disorder, a shoulder impairment, and left leg radiculopathy.  [R. at 377].  Although these impairments are "severe" within the meaning of the Social Security Regulations, the ALJ found at the third step that they did not alone or in combination meet or equal the requirements for any impairment listed in Appendix 1, Subpart P, Regulations No. 4. [R. at 15, 19].  The ALJ found at the fourth step of the sequential evaluation that the claimant was unable to perform any of his past relevant work.  [R. at 376-77].  At the fifth step, however, the ALJ concluded that the claimant could perform a significant

15

number of jobs in the national economy.  [R. at 376-77].  Therefore, the ALJ found

that the claimant was not under a disability at any relevant time.  [R. at 378].  Plaintiff

argues that the ALJ's decision is not supported by substantial evidence.  According to

Plaintiff, the ALJ erred in his determination of the claimant's residual functional

capacity ("RFC") and failed to offer a complete hypothetical question to the vocational

expert ("VE").  Plaintiff also argues that the ALJ made new findings which were

precluded by *res judicata*.  [Doc. 12].

### A.      RFC Assessment and Hypothetical Question to the VE

"The residual functional capacity is an assessment, based upon all of the relevant

evidence, of a claimant's remaining ability to do work despite his impairments.  Along

with his age, education and work experience, the claimant's residual functional

capacity is considered in determining whether the claimant can work."  Lewis v.

Callahan,125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. §§ 404.1545(a),

404.1520(f)).  The ALJ must make a complete RFC assessment, and he must also

accurately and comprehensively describe the claimant's impairments when posing a

hypothetical question to a VE.  Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir.

1985).  In situations where the ALJ failed to ask the VE a comprehensive hypothetical

16

and the decision of the ALJ denying a claim is based significantly on the expert testimony, the decision is not based on substantial evidence.  Id.

Social Security regulations require an ALJ to consider the limiting effects of all of a claimant's impairments, even those that are not severe.  20 C.F.R. § 404.1545(a), (e).  The regulations state: "Your impairment(s) and related symptoms, such as pain, may cause limitations of function or restrictions which limit your ability to meet certain demands of jobs.  These limitations may be exertional, nonexertional, or a combination of both."  20 C.F.R. § 404.1569a(a).  Twenty C.F.R. § 404.1569a(b), entitled "Exertional limitations," provides, "When the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect only your ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling), we consider that you have only exertional limitations." Twenty C.F.R. § 404.1569a(c)(1), entitled "Nonexertional limitations," provides, "When the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect only your ability to meet the demands of jobs other than the strength demands, we consider that you have only nonexertional limitations or restrictions."  The regulation then lists some examples of nonexertional limitations:

17

(i) You have difficulty functioning because you are nervous, anxious, or depressed; (ii) You have difficulty maintaining attention or concentration; (iii) You have difficulty understanding or remembering detailed instructions; (iv) You have difficulty in seeing or hearing; (v) You have difficulty tolerating some physical feature(s) of certain work settings, e.g., you cannot tolerate dust or fumes; or (vi) You have difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching.

20 C.F.R. § 404.1569a(c)(1). Social Security Ruling ("SSR") 83-10 further clarifies that a nonexertional impairment is "[a]ny impairment which does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for fine activities." SSR 83-10.

In the present case, the ALJ found that the claimant had the residual functional capacity to lift and carry twenty pounds occasionally, lesser amounts more frequently. The ALJ found that the claimant's work can be performed sitting or standing and would involve limited bending, twisting, crouching, or crawling for any kind of repetitive periods over a sustained period of time. In addition, the work would not expose the claimant to moving machinery or unprotected heights. [R. at 377]. At the administrative hearing, the ALJ asked the VE the following hypothetical question:

18

> The question is, assuming that a person has the ability to lift and carry 20 pounds occasionally, and lesser amounts more frequently; that they would have work that would afford–or could be performed sitting or standing; that the work would involve limited bending, and twisting, and crouching, and crawling, and for, for any kind of repetitive periods over a sustained period of time. . . .  And assuming that this person was in the age range of 39 to 44, would have a . . . limited education as that's defined by Social Security regulations. . . .

[R. at 446].  The VE responded that the hypothetical person would not be able to perform any of the claimant's past relevant work.  [R. at 446].  However, the VE testified that there were other jobs existing in significant numbers at the sedentary unskilled level that the claimant could perform.  [R. at 447].  The VE gave examples of these types of jobs, which included production worker, inspector, grader, sorter, document preparer, assembler II, and electrical subassembler.  [R. at 447].  The ALJ asked the VE, "Do these jobs expose a person to heavy moving machinery, dangerous situations, unprotected heights, this kind of thing?"  [Id.].  The VE testified, "[T]he jobs that I described in the sedentary unskilled category certainly would not, and I think there would be some jobs as an electrical subassembler . . . other assembler jobs that would not."  [Id.].

Plaintiff argues that the ALJ erred by not including in the RFC a number of nonexertional limitations.  Plaintiff contends that the RFC assessment should have

19

included the claimant's borderline intellectual functioning and illiteracy. According to Plaintiff, the ALJ incorrectly omitted the nonexertional impairments found by Dr. John Muller, such as a fair ability to function independently, no ability to handle complex job instructions, and a fair ability to handle detailed but not complex instructions. [Doc. 12 at 12-13]. Plaintiff argues that the ALJ's RFC also should have included the claimant's back pain and the fact that he was required to use a cane to ambulate. [Id. at 13-14]. Plaintiff also alleges that the ALJ erred by not including these limitations in the hypothetical question posed to the VE. [Doc. 12 at 15-18]. The court finds Plaintiff's arguments unpersuasive.

The ALJ made it clear in his decision that he gave consideration to the claimant's impairments, even those that were non-severe, which is what the regulations require. The ALJ explained that he considered the claimant's borderline intellectual functioning, but for reasons explained in his decision, he found that it was not a severe impairment. [R. at 370]. The ALJ wrote that he gave substantial weight to the psychological exam performed by Dr. Muller and noted that "Dr. Muller found that the claimant had borderline intellectual functioning, but was capable of working at jobs with simple instructions." [R. at 308, 372]. The ALJ explained: "The facts of this case reasonably support a finding that the claimant would have been no more than mildly

20

limited in maintaining social functioning, mildly limited in activities of daily living, and mildly limited in concentration, persistence, or pace." [R. at 370].  The ALJ noted that the claimant's borderline intellectual functioning produced no episodes of decompensation.  Moreover, as the ALJ pointed out, the "claimant had been employed at both semi-skilled and unskilled jobs for a number of years with this impairment." [R. at 370].  These facts provide significant support for the ALJ's finding that the claimant's alleged mental impairment was non-severe.  Because "the hypothetical question posed by the ALJ may omit non-severe impairments," the ALJ's decision not to include the mental impairment in his hypothetical was proper.  Loveless v. Massanari, 136 F. Supp. 2d 1245, 1250-51 (M.D. Ala. 2001) (citing Pendley, 767 F.2d at 1563).  See also Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

The ALJ instructed the VE to assume that the hypothetical individual had a "limited education as that's defined by Social Security regulations."  [R. at 446].  As the Commissioner correctly notes, the regulations provide, "Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs."  20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3).  The VE took into consideration the ALJ's instruction to assume that the hypothetical person

AO 72A
(Rev.8/82)

had a limited education, and the VE testified that such a person could perform a number of unskilled jobs.

The claimant's attorney asked the VE to assume that the hypothetical individual would have a number of impairments, including a "reading level at the second grade level." [R. at 448-50]. In his response, the VE made it clear that any alleged illiteracy or low level reading ability would have no impact on the VE's opinion regarding the unskilled work which the hypothetical person could perform. [Id.]. The VE's finding in this regard was consistent with the introductory portion of the medical vocational guidelines, which provides: "While illiteracy or the inability to communicate in English may significantly limit an individual's vocational scope, the primary work functions in the bulk of unskilled work relate to working with things (rather than data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(h)(4)(I). Given these facts, the undersigned concludes that substantial evidence supports the ALJ's decision regarding the claimant's borderline intellectual functioning and illiteracy.

Plaintiff argues that in the RFC assessment and the hypothetical question posed to the VE, the ALJ should have included limitations caused by the claimant's back pain

and the fact that he was required to use a cane to ambulate. [Doc. 12 at 13-14, 17-18].

The ALJ considered the testimony from the claimant and other witnesses regarding

limitations caused by his pain, but the ALJ found that the medical evidence did not

support the claimant's allegations and that the testimony was not fully credible. [R.

at 372-73]. The ALJ noted, for example, that "x-rays from Grady in 1996 indicated

that the claimant's degenerative disc disease was early, inferring mild." [R. at 265,

371]. The ALJ also explained that Dr. Hansen performed a physical exam of the

claimant in 1999 and found "no range of motion limitations in his back." [R. at 326-

27, 371]. With respect to the witnesses' testimony regarding the claimant's alleged

pain, the ALJ noted that the claimant's daughter testified that he drove on a daily basis

and "that he installed ceiling fans during the period at issue." [R. at 373, 434-35]. As

the ALJ explained in his decision, the fact that the claimant was able to perform the

physically demanding job of installing ceiling fans contradicts his allegations regarding

back and shoulder pain and his alleged need to walk with a cane. [R. at 373]. Because

the ALJ fulfilled his obligation of providing explicit and adequate reasons for

discrediting the claimant's testimony of pain, the undersigned concludes that

substantial evidence supports the ALJ's decision not to include the alleged pain

limitations in the RFC assessment and the hypothetical.  Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

Plaintiff makes a brief argument that the ALJ erred because he did not consider the claimant's limitations in combination.  [Doc. 12 at 14].  Plaintiff is correct in noting that the ALJ is required to consider the combined effect of the claimant's impairments.  The Eleventh Circuit Court of Appeals, however, has held that to satisfy this requirement, the ALJ simply needs to state that he considered a combination of the claimant's impairments.  Jones v. Dep't of Health and Human Servs., 941 F.2d 1529, 1533 (11th Cir. 1991) (citing Wheeler v. Heckler, 784 F.2d 1073, 1076 (11th Cir. 1986)).  In the present case, the ALJ noted in his decision that the "claimant's medically determined severe impairments do not alone *or in combination with other impairments* meet or equal an impairment listed at 20 C.F.R. 404, Subpart P, Appendix 1." [R. at 377].  On the basis of this statement, the undersigned concludes that the ALJ adequately considered the combined effect of the claimant's impairments.  Jones, 941 F.2d at 1533; Wheeler, 784 F.2d at 1076.

Plaintiff next argues that the ALJ did not include in the hypothetical any questions about the claimant's limitations caused by his seizures.  [Doc. 12 at 16-17].  Plaintiff wrote, "It is interesting to note that though the ALJ has limitations in the RFC

24

that may relate to a seizure disorder; namely to avoid machinery and unprotected heights, the ALJ did not include these limitations in the hypothetical." [Id.]. Plaintiff is incorrect. After the ALJ presented his initial hypothetical question to the VE, the VE testified that although the claimant could not perform his past relevant work, there were other jobs existing in significant numbers at the sedentary unskilled level that the claimant was able to perform. [R. at 447]. The ALJ then asked the VE, "Do these jobs expose a person to heavy moving machinery, dangerous situations, unprotected heights, this kind of thing?" [Id.]. The VE testified, "[T]he jobs that I described in the sedentary unskilled category certainly would not, and I think there would be some jobs as an electrical subassembler . . . other assembler jobs that would not." [Id.]. Because the ALJ included in his hypothetical limitations related to the claimant's seizure disorder, Plaintiff's argument on this issue is unpersuasive.

The court finds that the ALJ's assessment of the claimant's residual functional capacity was supported by substantial evidence. The ALJ also presented a hypothetical question to the VE that accurately and comprehensively described the claimant's impairments. When the ALJ decided not to include certain alleged limitations in the RFC or hypothetical question, he give explicit and adequate reasons for doing so. For these reasons, the undersigned concludes that this aspect of the ALJ's decision was

supported by substantial evidence and was the result of an application of proper legal standards.

### B.      Res Judicata

As discussed *supra*, claimant Anthony Finley filed applications for a period of disability, disability insurance benefits, and supplemental security income on February 13, 1997.  [R. at 135-38].  An administrative hearing was held on August 3, 1999, and the claimant died slightly more than three months later, on November 24, 1999. [R. at 51-85, 194-247, 395].  The ALJ denied the claimant's applications on September 12, 2000, and an appeal was filed in the Northern District of Georgia on February 25, 2002.  [R. at 13-34].  The district court issued a consent order filed on February 26, 2002, reversing the decision and ordering the ALJ, upon remand, to "clarify what impairments are found to be severe; clarify the residual functional capacity; and obtain supplemental evidence from a vocational expert to clarify the effect of the impairments on the occupational base."  [R. at 381-82].  The Appeals Council subsequently vacated the prior decision and remanded the case to an ALJ for further proceedings consistent with the court's order.  [R. at 384-85].  The ALJ issued a decision on June 14, 2005, denying Plaintiff's claim and finding that the claimant had not been under a disability at any time before his death.  [R. at 365-78].

Plaintiff notes that in the first hearing decision issued in September 2000, the ALJ found that the claimant had the following severe impairments: borderline intellectual functioning; a seizure disorder; L-5 and S-1 spondylolisthesis with lumbrosacral radiculopathy; and periodic pain and discomfort. [R. at 21]. In the second decision issued in June 2005, the ALJ found that the following impairments were severe: mild levoscoliosis of the lower lumbar spine; spondylolisthesis of the L-5 and S-1 joints, early (mild) degenerative joint disc disease at the L4-L5 and L-5, S-1 joints; a seizure disorder; a shoulder impairment; and left leg radiculopathy. [R. at 377]. Although the claimant's borderline intellectual functioning and periodic pain and discomfort were initially found to be severe impairments, the ALJ concluded in the second decision that these were not severe impairments. Plaintiff notes that the claimant died in November 1999, prior to the ALJ's first decision. Plaintiff writes, "Thus, nothing could have changed between the 2 decisions in order for the ALJ to revise his findings." [Doc. 12 at 19]. Plaintiff argues that the ALJ was precluded from changing his findings regarding the claimant's pain and borderline intellectual functioning based on the doctrine of *res judicata*. [Doc. 12 at 18-20].

In his memorandum, Plaintiff cited to the Eleventh Circuit's opinion in <u>Draper v. Sullivan</u>, 899 F.2d 1127 (11th Cir. 1990), in support of his argument that *res judicata*

27

precluded the ALJ from changing his findings with respect to the claimant's severe impairments.   [Doc. 12 at 18].   The Draper court explained that an "initial determination," as defined by Social Security regulations, is "binding unless the claimant requests a reconsideration within the statutory period or the Secretary revises or reopens the 'initial determination.'"   Id. 899 F.2d at 1130.  Citing 20 C.F.R. §§ 404.900(a)(1) and 404.902, the court wrote, "Determinations of entitlement or continuing entitlement to benefits, of the amount of benefits, or of a reduction in benefits due to the receipt of worker's compensation benefits are 'initial determinations.'"  Draper, 899 F.2d at 1130.  The determination at issue in Draper was the original calculation of the claimant's disability benefits and the decision that these benefits were not subject to offset by the claimant's statutory worker's compensation benefits.  Id. at 1128-30.  Because this constituted an initial determination, the Draper court held that the doctrine of *res judicata* made the determination final and that the Administration was not permitted to reopen the determination under the facts therein. Id. at 1130-31.

In the present case, the ALJ's decision was not an "initial determination" as the two terms are defined differently in the Social Security regulations.  The regulations state that an initial determination "is a determination we make about your entitlement

28

or your continuing entitlement to benefits or about any other matter, as discussed in [a subsequent section of the regulations], that gives you a right to further review." 20 C.F.R. § 404.900. On the other hand, a decision is one issued by an ALJ as part of the administrative process after a dissatisfied claimant requests reconsideration of an initial determination. Id.; 20 C.F.R. § 404.901 ("Decision means the decision made by an administrative law judge or the Appeals Council."). "An initial determination is binding unless [the claimant] request[s] a reconsideration within the stated time period, or [the Administration] revise[s] the initial determination." 20 C.F.R. § 404.905. See Draper, 899 F.2d at 1130.

In the present case, the claimant requested reconsideration of the initial determination and continued to follow the steps necessary to exhaust his administrative and judicial remedies. Pursuant to the district court's order, the ALJ's decision was vacated by the Appeals Council, and the case was remanded to the ALJ for further proceedings consistent with this court's order. [R. at 384-85]. The ALJ subsequently issued a new decision. [R. at 365-78]. The undersigned concludes that the doctrine of *res judicata* did not preclude the ALJ from making new findings because his findings of fact in the first decision did not constitute an initial determination and

29

because the appeals process was utilized in a manner consistent with the regulations and the Eleventh Circuit's holding in <u>Draper</u>.

At the hearing before the undersigned, the decision in <u>Albright v. Comm'r of the Social Security Admin.</u>, 174 F.3d 473 (4th Cir. 1999), and <u>Drummond v. Comm'r of the Social Security Admin.</u>, 126 F.3d 837 (6th Cir. 1997), were discussed as support for the argument that the ALJ was precluded from changing his findings regarding the claimant's impairments based on the doctrine of *res judicata*.  These decisions held that "the principles of *res judicata* can be applied against the Commissioner.  When the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances."  <u>Drummond</u>, 126 F.3d at 842.  <u>See also</u> <u>Lively v. Secretary of Health and Human Servs.</u>, 820 F.2d 1391 (4th Cir. 1987).

The Eleventh Circuit has not adopted the reasoning of the Fourth and Sixth Circuits.  And the undersigned concludes that these holdings should not be applied in the present case to the extent that they stand for the proposition that an ALJ's findings of fact bind any subsequent ALJ unless new evidence has been introduced.  <u>Drummond</u>, 126 F.3d at 842.  If the ALJ in this case was bound by the findings of the prior case, then, as the Commissioner notes, he would have been required to find that

30

the "claimant was not under a 'disability'" at any time up until the date of the claimant's death because this was a finding made in the first decision.  [R. at 25]. Moreover, as discussed *supra*, this court entered a consent order reversing the ALJ's first decision and ordering the ALJ to "clarify what impairments are found to be severe. . . ."  [R. at 381-82].  The ALJ complied with the order and clarified his findings regarding the claimant's severe impairments.  Yet, according to Plaintiff, the doctrine of *res judicata* precluded the ALJ from making any changes in his findings of severe impairments.  The undersigned is not persuaded that the Social Security appeals process was intended to make an ALJ "bound by the findings of a previous ALJ," irrespective of a reviewing court's order to the contrary.  <u>Drummond</u>, 126 F.3d at 842.

## VI.    Conclusion

For all the foregoing reasons and cited authority, the court finds that the decision of the ALJ was supported by substantial evidence and was the result of an application

of proper legal standards.   It is, therefore, **ORDERED** that the Commissioner's

decision be **AFFIRMED**.

     **SO ORDERED**, this 8th day of March, 2007.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A

(Rev.8/82)